Filed 8/19/14  In re E.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re E.C. et al., Persons Coming Under the Juvenile Court Law. |  |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.A. et al., <br><br> Defendants and Appellants. | E060614 <br><br> (Super.Ct.Nos. J244717, J244718, J244719, J244721 & J247736 <br><br> **OPINION** |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Serobian Law, Inc. and Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant K.A.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant R.C.

1

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

In June 2012, San Bernardino County Children and Family Services (CFS) detained five children, then ten-year-old Q.L., eight-year-old A.A. (who is not a party to this appeal), two-year-old twins E3 and E4, and four-month-old E2. Mother is the mother to all children. Father is father of E2, E3, and E4, but not the father of Q.L. The dependency commenced after E3 reportedly fell from a play house and sustained head trauma. The doctors at the hospital determined that a fall could not have caused the acute bleeding in the brain. E3's discharge diagnosis was that the injury was caused by non-accidental trauma. The parents later reported substance abuse and domestic violence in the home. A petition under Welfare and Institutions Code[1] section 300 was filed on behalf of the children. Family reunification (FR) services and supervised visitations were offered to parents.

In January of 2013, CFS detained newborn E1. Mother and father are the parents of E1. A petition under section 300 was filed on behalf of E1.

In March of 2011, the court found the parents' compliance as to the FR services regarding Q.L., E2, E3, and E4 was minimal and terminated FR services. As to E1, the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

court sustained his petition and bypassed FR services because of the lack of progress regarding his older siblings' dependency case.

In September and December of 2013, mother filed section 388 petitions requesting reinstatement of services and increased visits with the children. The court summarily denied both her petitions.

At the section 366.26 hearing on January 6, 2014, the court found E1, E2, E3, and E4 adoptable and terminated parental rights. The court selected long-term foster care as the permanent plan for Q.L.

On appeal, mother contends that the trial court abused its discretion in denying her second section 388 petition without a hearing. For the reasons set forth below, we find that the trial court properly denied mother's petition.

II

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

A.    *Detention, Jurisdiction/Disposition*

Mother has had at least eight children born from approximately 1998 to 2012. Six are involved in this case: E1, E2, E3, E4, A.A. and Q.L. The E children are subjects of this appeal. They were born between June 2010 and November 2012. Their presumed father is R.C. (father and one of the appellants in this case). Mother was pregnant with E1 when the dependency case as to Q.L., E2, E3, and E4 was filed.

On June 11, 2012, one of the twins, E4 was vomiting and lethargic. He was two years old at this time. He was taken to the hospital where he was diagnosed with subarachnoid hemorrhage/brain injury; he possibly had other head injuries. Dr. Amy

3

Young found the parents' explanation for the injuries, falling off a playhouse, to be inconsistent with the injuries. Dr. Young felt the injuries were "highly suspicious" and suspected physical abuse. That day, father was transported to jail on a parole violation.

Two days later, on June 13, CFS responded to a child-welfare referral relating to E4's injuries. CFS detained E2, E3, A.A., and Q.L. in foster care. On June 15, E4 was released from the hospital and placed with his siblings. E2 is the only female among the five siblings; she was four months old when detained. E3 and E4 are twins who turned two years old in June. The twins are not father's biological children. Father, however, held them out as his own since moving in with mother in 2009. A.A. was eight years old and Q.L. was ten years old when detained.[2] A.A.'s presumed father secured placement of A.A. in July 2012.

Between 2010 and 2012, father was incarcerated six times for parole violations. He also has a 2006 conviction for receiving stolen property. Mother has no known criminal history. She, however, had several inconclusive or unfounded child-welfare referrals from 2001 to 2010. In February 2012, general neglect allegations were substantiated.

On June 18, 2012, CFS filed petitions in the juvenile court with allegations for E4 pled under section 300, subdivision (a) (serious physical harm); (b) (failure to protect); and (e) (serious physical abuse). The allegations reflected that E4 was physically abused on June 11, 2012, which resulted in a brain hemorrhage. The allegations also stated that

---

[2]    In November 2012, a sixth child in this sibling group, E1, was born. He was detained shortly after his birth and a dependency was initiated.

E4's injury would not ordinarily have occurred without unreasonable or neglectful acts or omissions by the parents. E4's siblings' petitions included section 300, subdivision (j) allegations (abuse of sibling), relating to the physical abuse of E4 resulting in his brain hemorrhage.[3]

On June 19, 2012, the juvenile court detained the children and ordered supervised visitation for the parents. Father's visitation would commence upon his release from custody.

On June 26, 2012, Dr. Young noted that Q.L. was parentified. Q.L. reportedly worried about sibling diaper changes and feedings. Relating to E4's injuries, Q.L. stated that E4 fell so Q.L. took E4 inside to father. Father was mad that E4 would not stop crying and "spanked and hit" E4. Q.L. stated that father is mean and "doesn't like the twins crying[;]" gets "mad" and hits the twins in the head; and pushed E4 into a drawer and in the head causing bruising and a lump to E4's forehead. Q.L. then "corrected" himself to suggest it was "an accident." Q.L. was worried about mother.

When E3, E4's twin, first went to foster care, his caregivers noted bruises on his body. E3 clung to his brothers and seemed nervous with noise increases; he cowered and shielded himself. On June 26, 2012, Dr. Young noted marks, scars, bruises, and abrasions on E3's head, abdomen, buttock, thigh, and upper extremity. E3 also had a scar inside his lip and dental decay. Dr. Young found E3's injuries to be consistent with physical abuse; his teeth suggested dental neglect.

---

[3]     The reporter's transcript indicates that A.A. and Q.L. had section 300, subdivision (j), allegations identical to those found in the petitions of E2 and E3.

Dr. Young also evaluated A.A., who reported that father could be mean and yell. A.A. had bad dreams, trouble sleeping, and did not want to eat. He had no specific injuries of note. Dr. Young, however, was still concerned about child abuse.

On June 27, 2012, A.A. and Q.L. received forensic interviews. A.A. stated that father spanks the twins on their "butt." He described E4 hitting father back. A.A. also stated that E3 cries when father spanks him. Father had spanked A.A. in the back with his hand softly. A.A. gets "mad" when father spanks him and A.A. told mother about it. A.A. stated that father also spanks Q.L.

In his interview, Q.L. detailed E4's fall from the playhouse. E4 hit his head on the hard sand. Q.L. carried E4 to mother and father. E4 was crying and father was "mad" that E4 continued to cry, and spanked E4 in the hand for crying. Mother and Q.L. told father to stop hitting E4. Q.L. described E4 as falling asleep, then throwing up and getting "dizzied." Q.L. also wished mother and father would stop arguing. According to Q.L., they yell and it makes him feel "bad." Q.L. indicated that he and A.A. take care of the twins by making them bottles and putting them to sleep at mother's request.

At the jurisdictional/dispositional hearing on July 10, 2012, father was still in jail. A.A. was placed with his presumed father; the other children were still in foster care.

When interviewed, mother said that E4 fell from a playhouse and may have hit his head. She bathed him and put him down for a nap; he woke up vomiting. Father bathed him again but E4 was not playing like usual. They put him down for another nap. E4 slept for 20 minutes then woke up vomiting and lethargic. Mother told father to call 911.

Mother denied that the parents physically disciplined the children; she used time outs instead.

Father was interviewed. He stated that mother was on bed rest so he checked on the children every five to ten minutes. Q.L. came in with E4, who was crying. Father changed E4's diaper, and put him down to nap near mother. An hour later, E4 woke up vomiting. He gave E4 a bath and put him back down to sleep. He thought E4 had the stomach flu. He went to the store. When he returned, he learned that E4 vomited again. Mother put him in the shower; E4 was just lying in her arms. Father told her to call 911 but she said to wait. Father again told her to call 911. Father denied physically abusing E4; he spanked the twins on their butts over their diaper.

CFS determined that the parents' explanations for E4's injuries were inconsistent with the diagnosis of bilateral acute and chronic subdural hematomas, which were deemed non-accidental trauma. CFS also learned that the parents were substance abusers. In February 2012, when E2 was born, mother tested positive for methamphetamine and opiates. Both parents admitted using methamphetamine in recent months. Father's parole violation was due to a dirty drug test.

CFS also learned that the parents engaged in domestic violence. Both parents admitted to arguing, pushing and shoving each other. Father admitted hitting mother, and that he had anger issues. The parents, however, denied that the children were around when they argued.

On July 9, 2012, CFS filed amended section 300 petitions. It added allegations relating to the parents' failure to protect the children from their substance abuse and

7

domestic violence. Also, new subdivision (g) allegations (no provision for support) reflected father's incarceration. Moreover, in the amended petition, E4's subdivision (e) allegations were replaced with subdivision (a) allegations, as follows:

"On or about June 11, 2012, while in the care and custody of the . . . [parents,] the child . . . [E4], sustained non-accidental head trauma including but not limited to, bilateral acute and chronic subdural hematomas causing substantial pain and suffering to the child."

The petitions of E2 and E3 also included new allegations, under subdivision (j), stating that E4's "non accidental head trauma" placed E2 and E3 at risk. Moreover, E3's petition included a new subdivision (a) allegation, stating:

"On or around June 11, 2012, while in the care and custody of the . . . [parents,] the child . . . [E3] sustained non accidental injuries to include: bruises, scars and abrasions to the head, abdomen, buttocks, thigh and upper extremity and scarring to the mouth causing substantial pain and suffering to the child."

CFS recommended that the court sustain the allegations, deem father the presumed father for E2, E3 and E4, and order FR services requiring the parents to engage in general counseling, a domestic violence program, a parenting education program, substance abuse outpatient treatment, random drug testing, and a 12-step program.

On August 15, 2012, the parents waived their rights. The court sustained the petitions with minor amendments to the allegations (i.e., stating that the parents had a "history" of substance abuse). Since father was out of jail, subdivision (g) allegations were dismissed. A.A. was removed from mother, and his case was dismissed with a

family law order granting his father physical custody. The court also ordered removal of E2, E3, E4, and Q.L., and their placement in foster care. The court deemed father the presumed father for E2, E3, and E4, and ordered the parents to engage in the case plan proposed by CFS. Additionally, the parents were to receive supervised visits with the children at least twice weekly for two hours.

B.    *Detention and Jurisdiction/Disposition for Newborn E1*

In November 2012, E1 was born at 28 weeks gestation and placed in the neonatal intensive care unit (NICU). Father is E1's father. Mother tested positive for amphetamines. On January 19, 2013, when E1 was ready to be discharged from the hospital, CFS determined that E1 was at risk due to parental substance abuse, domestic violence, and physical abuse. The parents led transient lifestyles, lacked provisions for E1, and made minimal progress in their case plans. CFS detained E1 in foster care and initiated dependency proceedings.

On January 19, 2013, father was arrested again for a parole violation. On January 23, 2013, CFS filed a section 300 petition for E1, with allegations under subdivision (b), indicating that mother had a chronic substance abuse problem, father also abused substances, and the parents engaged in domestic violence. A subdivision (g) allegation addressed father's incarceration, and subdivision (j) allegations for E1 detailed allegations sustained in the siblings' open dependency.

On January 24, 2013, at E1's detention hearing, the juvenile court detained E1 in foster care, ordered mother to drug test, and set E1's jurisdiction/disposition hearing for February 14, 2013, the day of the siblings' six-month review hearing.

9

The jurisdiction/disposition report for E1, dated February 14, 2013, recommended that the juvenile court sustain E1's petition, remove E1 from parental custody, and order FR services for the parents. The report included facts from the siblings' dependency, and informed the court that the parents were not progressing in their case plans. Father indicated he was just being "lazy." CFS also learned that mother had two teen daughters who were not involved in the present dependency proceedings. The daughters lived with their father, in part due to the condition of mother's home.

On February 14, 2013, at the jurisdiction/disposition hearing, counsel for E1 objected to the parents receiving FR services. Therefore, the court set trial for March 11, 2013.

C.      *Six-month Review Hearing for the Four Siblings*

The six-month review hearing report for the four older siblings, dated February 14, 2013, indicated that the parents resisted reform in the review period. They also moved approximately five times. Mother stated that she was hospitalized but failed to provide proof. A prior substantiated referral in February of 2012 stated that mother tested positive for methamphetamine and opiates at E2's birth, and at E1's birth in November of 2013. The parents had no income. CFS gave the parents referrals to food banks and their case plan components. Mother tested negative once, but was terminated from her substance abuse program in October of 2012 for lack of participation.

The parents explained that they attended AA/NA meetings and vowed to provide proof of their attendance. Mother blamed father for weighing her down and said she was going to "kick him to the curb." CFS placed the parents in a random drug-testing

10

program. When mother was asked if she would test positive, she presented a Vicodin prescription for her tooth pain, and indicated she may test positive. The social worker warned that a positive test would not look good.

Despite their dismal progress in complying with the FR services plan, the parents attended supervised visits with the children. CFS recommended continued FR services for the benefit of Q.L., who was much older than his siblings.

Counsel for the children objected to continued services for the parents. The court, therefore, set trial for March 11, 2013, the same date as E1's contested jurisdiction/disposition hearing.

D.      *Contested Six-month Review Hearing and E1's Jurisdiction/Disposition Hearing*

By March 2013, CFS recommended termination of parental rights for the four siblings, and FR bypass in E1's case due to the parents' failure to treat the problems that led to removal of the siblings under section 361.5, subdivision (b)(10).

CFS documented mother's continued resistance to comply with the court-ordered FR services. For example, on January 24, 2013, she was a no show for a court-ordered drug test. Mother claimed that she tested at a certain clinic, but the social worker established otherwise. Lab findings also showed that mother was positive for methamphetamine on February 14, 2013. Moreover, on February 25, 2013, although mother tested negative at an intake appointment at the High Desert Center, the Center recommended an intensive program. Mother stated that she had insufficient transportation to do so. The social worker disputed mother's statement because mother

11

had adequate bus passes. Father was in jail during the review period and made minimal progress in his reunification plan.

Moreover, mother reportedly failed to submit to random drug testing when her color came up on January 30, and February 15, 2013.[4] The social worker believed mother evaded testing. Mother also attended only two group meetings, and three 12-step meetings.

At the trial on March 11, 2013, the social worker testified that as of March 7, 2013, mother started participating in counseling services for parenting, domestic violence, and anger management. The social worker did not recommend further FR services because nothing had changed; mother tested positive and failed to test, and appeared deceitful.

Mother testified that she believed she would get services done. She attended NA meetings, but admitted that she failed to bring proof of her attendance. "They" said she tested positive for methamphetamine, but mother tried to attribute that result to taking over-the-counter medicine for her tooth.

The juvenile court was "underwhelmed" with the parents' progress. It terminated FR services related to the four siblings, and set a section 366.26 hearing for July 9, 2013.

As to E1, the court found the allegations true with minor amendments, deemed father presumed for E1, removed E1 from the parents, and applied FR bypass, finding

---

[4] Clients on the color code testing system are assigned a certain color, and then are required to call a toll-free number daily to hear a message instructing whether or not they must test that day.

that the parents did not make reasonable efforts to treat the problems leading to removal of the siblings under section 361.5, subdivision (b)(10). The court ordered supervised visits for the parents, set E1's section 366.26 hearing to join with the siblings' cases, and read writ rights to the parents. No writs were filed.

E.     *Section 366.26 and Section 388 Hearings*

1.     *Section 366.26 report*

The July 2013 section 366.26 hearing was trailed to November 2013 to allow CFS to assess permanent planning options and to place the children together in a concurrent planning home. The E children were eight months old, one and a half years old, and three years old. Q.L. was 11 years old and objected to being adopted.

The section 366.26 report stated that father was incarcerated since May 2013 for attempted domestic battery on mother. He reportedly got out of jail and went to mother's home to wish her a happy Mother's Day, but assaulted her instead. In addition, mother attended supervised visits every other week. She discussed the case with Q.L., making him cry. She also appeared for a visit with bruising on her face, caused by father. She asked if she should tell the children about her altercation with father. The report indicated that Q.L. was the only child expressing any distress when visits with mother were over. Finally, the social worker concluded that there were no sibling exceptions to adoption since the siblings lived together and shared existing beneficial sibling bonds.

13

### 2. *Mother's first section 388 petition*

On September 9, 2013, mother filed a section 388 petition seeking to reinstate FR services for the five siblings. In support, mother stated that she was visiting the children. She also attended courses and counseling from May through early August of 2013, and completed a domestic violence program. She attended therapy with one counselor from March 7, to April 18, 2013, and with another in June 2013. She was reportedly motivated and willing to make changes, and showed growth in setting boundaries regarding domestic violence. Two shelter residents, a mother and child, wrote letters endorsing mother's petition.

Mother's petition did not include substantive assessments of her progress in her case plan. It also did not include a qualified opinion stating that FR services to mother served the best interests of the children. Mother also lacked proof that she complied with substance abuse treatment and testing. Mother only presented proof of her attendance at five AA meetings in June and July 2013, and an agreement to pay for treatment, without proof of attendance.

On September 12, 2013, the juvenile court found that the petition failed to present new evidence or a change of circumstances; the court denied the petition.

### 3. *Addendum to section 366.26 report*

The section 366.26 addendum, for the hearing date scheduled for November 26, 2013, requested that the court terminate parental rights for E1, E2, E3, and E4, to permit adoption by Mr. and Mrs. Z (the prospective adoptive parents), and order a Planned Permanent Living Arrangement (PPLA) for Q.L. In January 2013, E1 was placed with

the prospective adoptive parents, and in August 2013, the other siblings were also placed there.  Q.L. wished to remain there, but did not want to be adopted.  The prospective adoptive parents supported Q.L. and respected his wishes, but were committed to adopting him if he changed his mind.

The children had well-child examinations with no notable concerns.  E1 and E2 have apparent developmental delays, but are reciprocally bonded to the prospective adoptive parents.  E3 has speech and language delays, and possible mental retardation, but his emotional status appeared greatly improved and his tantrums ceased.  E3 also appeared bonded with the prospective adoptive parents.  E4 has probable developmental delays, but his mental and emotional status appeared to be improving.  His tantrums diminished and he was responding to therapeutic services.  Q.L. was diagnosed with ADHD, but medication was not recommended for him.  He has no developmental delays.  The E children were referred to service providers to address their apparent delays, except for E3, who was referred to rule out delays.

The adoption social worker opined that the E children were appropriate to be adopted because of their young ages and the prospective adoptive parents' willingness to adopt the children.  The prospective adoptive parents met the needs of the children, and have developed a warm and loving parent/child bond with the children.  The children were thriving in this placement.

Mother had irregular visits with the children since she moved out of the area.  Visits were established closer to mother but she was reportedly a "no call, no show" for the first such visit.  Q.L. was in tears.  Q.L. continues to worry about mother.  Mother

showed up for a recent visit; it went well.  Mother behaved appropriately.  Q.L. has an emotional bond with her.  CFS, therefore, recommended a PPLA for Q.L.

4.  *Mother's second section 388 petition*

On December 13, 2013, mother filed her second section 388 petition seeking FR services for the children and more visits.  The petition stated that mother did not know if father agreed with her request.  She was participating in a program at "Shields for Families" (Shields) in Compton.  Her prior section 388 petition was attached to show mother's "continuity and consistency in her programs."  Mother, however, switched from using service providers in San Bernardino County to using Shields in Los Angeles County.

Mother enrolled in a substance abuse treatment program at Shields; it was an 18- to 24-month program.  Clients attend treatment five days a week for eight hours daily.  Group sessions address substance abuse, anger management, parenting, domestic violence, etc.  Clients also receive individual counseling and submit to weekly random testing.  Mother lived in transitional housing at Shields and was required to pay rent and utilities, prepare her own meals, and arrange her transportation.

A Shields progress report indicated that mother was a "new client" at Shields as of October 22, 2013.  She attended all core functional groups and sessions, and appeared willing to learn about recovery.  She tested clean in two substance abuse tests out of two, and attended 12 dates of services with no absences.

In addressing the best interests of the children, the petition stated that mother visited the children bi-weekly.  The visits went well and the children recognized mother

16

as their mother. Additionally, the petition noted that Q.L. did not want to be adopted. The petition did not include a therapist report addressing the best interests of the children.

On December 16, 2013, the juvenile court found that the petition lacked new evidence or a change of circumstances, and did not promote the best interests of the children. The court summarily denied the petition.

### 5. *Contested section 366.26 hearing*

On November 26, 2013, at the section 366.26 hearing, mother was present. Father was incarcerated and not present. The parents sought to retain their parental rights. Trial was set for January 6, 2014.

Father was present for trial but mother was not. Respective counsel objected to the termination of parental rights, but did not present evidence. The court ordered PPLA for Q.L.; found E1, E2, E3, and E4 adoptable; terminated parental rights; and set a review hearing for July 7, 2014. However, when mother appeared late on the trial date, the court reopened evidence and allowed her to testify.

Mother testified that she visited her children every other week, for two hours. The visits were "great." She testified that she was very close to her children and "they know who I am." She stated that they are happy when she arrives for the visitations – they cry and embrace her. She testified that even E2 screams "Mommy, Mommy." Mother, however, admitted that she had not had any unsupervised visits. She also indicated that she was extremely close with Q.L., E2, E3 and E4, but did not have a bond with E1 because "he's still young." Mother testified that she cared for the other children upon their release from the hospital, but not E1. The other children knew who she was and

17

cried after visits. "I lost sight of a lot of things, but I'm still a mom . . . I have gotten clean . . . I'm happy. This is what I want. And I want it for my kids."

In closing argument, the attorneys for the parents objected to termination of parental rights. Mother's attorney also mentioned the court's denial of mother's section 388 petition; father's attorney did not. Counsel for CFS and the children asked the juvenile court to follow the recommendations made by CFS. The court expressed concern that mother showed up to court late, and asked for a second, third, or fourth chance, but had not made changes to show the court that she put the needs of the children before her own needs. The children need parents. The court found that E1, E2, E3 and E4 were adoptable and terminated parental rights. The court advised the parents of their appellate rights. The court also confirmed that PPLA was the appropriate plan for Q.L.

On January 6, 2014, mother filed a notice of appeal regarding E1, E2, E3 and E4; she stated that she was objecting only to the "termination of parental rights 1-6-2014." Q.L.'s case number and name are not mentioned in the notice of appeal.

Father filed his notice of appeal on February 10, 2014. His objection is to the "January 6, 2014, order of terminating parental rights." His notice named Q.L., E1, E2, E3 and E4, but father is not Q.L.'s father, and parental rights were not terminated for Q.L. Thus, on February 25, 2014, we found father to be a nonparty to Q.L.'s case and dismissed father's appeal relating to Q.L.

18

III

ANALYSIS

A.      *Mother's Notice of Appeal*[5]

CFS contends that "mother's appeal does not encompass the juvenile court's denial of her section 388 petition, and does not include Q.L."

Here, in mother's notice of appeal, it stated:  "The order appealed from was made under Welfare and Institutions Code section (*check all that apply*). . . ."  The box for "[s]ection 366.26" was checked.  There was no checkbox specifically for section 388.  However, there was a checkbox for "[o]ther appealable orders relating to dependency," which was *not* checked.

The denial of a section 388 petition is a separately appealable order.  (*In re Aaron R.* (2005) 130 Cal.App.4th 697, 703.)  A notice of appeal is supposed to "identif[y] the particular judgment or order being appealed."  (Cal. Rules of Court, rules 8.100(a)(2) [as to appeals generally], 8.405(a)(3) [as to juvenile appeals].)  However, "[i]t is a rule both ancient and sound that '[n]otices of appeal are not strictly construed, and an appeal will not be dismissed because of a misdescription of the judgment or order to which it relates unless it appears that the respondent has been misled by such misdescription.' [Citations.]" (*Dang v. Smith* (2010) 190 Cal.App.4th 646, 656-657.)  For example, one court has held that a notice of appeal from nonappealable jurisdictional findings made in

---

[5]      Father simply "joins with the issues raised in appeal by mother." Therefore, the outcome of father's appeal will be identical to the outcome of mother's appeal.

March 1986 could be construed as being from appealable dispositional orders made in April 1986. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 111-112.)

*In re Madison W.* (2006) 141 Cal.App.4th 1447 is on point. There, the mother filed a notice of appeal from an order terminating parental rights, which had been entered on January 13, 2006. In her opening brief, however, she challenged an order denying her section 388 petition, which had been entered on January 10, 2006. (*Id.* at pp. 1449-1450.) The court stated: "Because this is not the first time such a situation has presented itself to this court, we take this opportunity to hopefully resolve it once and for all, at least as to this court." (*Id.* at p. 1450.)

It then declared: "[W]e will henceforth liberally construe a parent's notice of appeal from an order terminating parental rights to encompass the denial of the parent's section 388 petition, provided the trial court issued its denial during the 60-day period prior to filing the parent's notice of appeal." (*In re Madison W.*, *supra*, 141 Cal.App.4th at p. 1451.) It explained: "First, the denial of such a section 388 petition is an appealable order. [Citation.] Second, the parent's notice of appeal is entitled to our liberal construction. [Citation.] Third, appellate jurisdiction to review an appealable order depends upon a timely notice of appeal. [Citation.] Fourth, the notice of appeal would be timely as to the denial of the parent's section 388 petition, provided the trial court denied the parent's section 388 petition within 60 days of when the parent filed the notice of appeal. [Citation.] And, finally, respondent is not prejudiced. [Citation.]" (*Id.* at p. 1450.)

The identical reasoning applies here. We therefore conclude that the mother's challenge to the order denying her section 388 petition is properly before us. Moreover, in the interest of justice, we shall treat mother's appeal as encompassing Q.L.

B.      *The Denial of the section 388 petition*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both a '"legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959 [Fourth Dist., Div. Two].)

A parent must have a prima facie showing under section 388 to trigger the right to a hearing. (§ 388, subd. (d); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; Cal. Rules of court, rule 5.570(h).) There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence; AND (2) that revoking the previous order would be in the best interests of the children. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.) A prima facie showing is made if the liberally construed allegations of the petition show *both* changed circumstances *and* that the best interests of the child may be promoted by petitioner's proposed change of order. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.) Merely changing circumstances is insufficient. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

21

A juvenile court's summary denial of a section 388 petition is reviewed on appeal for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' [Citation.]" (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

"It is only common sense that in considering whether a juvenile court abuses its discretion in denying a section 388 motion, the gravity of the problem leading to the dependency, and the reason that problem was not overcome by the final review, must be taken into account." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. omitted.) The *Kimberly F.* court "doubt[ed]" that "the parent who loses custody of a child because of the consumption of illegal drugs and whose compliance with a reunification plan is incomplete during the reunification period" could "ever show a sufficient change of circumstances to warrant granting a section 388 motion. . . . It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform." (*Id.* at p. 531, fn. 9.)

In this case, on August 15, 2012, the juvenile court sustained an allegation indicating that in the care and custody of the parents, E4 "sustained non-accidental head trauma including . . . bilateral acute and chronic subdural hematomas." As discussed in

detail above, evidence also showed that father physically abused the twins, E3 and E4; mother was aware but did not protect the children.

When evaluating a parent's section 388 petition requesting FR services, the court should reflect on any pattern of parental conduct posing risk to the children; past conduct is the best predictor of future conduct. (See *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170.) Here, there is a pattern of disconcerting parental conduct which resulted in "chronic subdural hematomas" to E4. Moreover, as discussed above, the siblings were also found to be at risk of abuse. Furthermore, E4's twin, E3, also suffered the following: "On or around June 11, 2012, while in the care and custody of the . . . [parents,] the child . . . [E3] sustained non accidental injuries to include: bruises, scars and abrasions to the head, abdomen, buttocks, thigh and upper extremity and scarring to the mouth causing substantial pain and suffering to the child."

Additionally, as discussed above, the parents had other serious issues endangering the children – domestic violence and substance abuse. On August 15, 2012, the court ordered the parents to engage in an FR case plan consisting of general counseling, a domestic violence program, a parenting education program, substance abuse outpatient treatment, random drug testing, and a 12-step program. Neither parents complied with the FR plan. Mother admitted that she "lost sight of a lot of things."

Mother filed a section 388 petition on December 13, 2013, seeking reinstatement of FR services and increased visits with the children. She included her September 2013 petition to illustrate her "continuity and consistency in her programs." Mother reported that her circumstances have changed given her participation in treatment programs and

23

negative drug test results. Mother attached several documents from service providers supporting her position. She also attached two character letters attesting to her changed circumstances. The juvenile court summarily denied her section 388 petition. For the reasons set forth below, we discern no abuse of discretion in summarily denying mother's petition.

After termination of FR services in March 2013, mother attended counseling with three successive therapists in 2013, from March to April, June to July, and October. One therapist reported that from March to April 2013, mother showed growth with domestic violence issues. Another stated that mother completed a domestic violence program by August 2013, and "actively participated in all the classes and groups." Two shelter residents, a mother and a child, wrote to endorse mother's petition. In sum, mother attended services in "spurts;" and the therapist reports supporting her petition provided hopeful encouragement to mother. The letters by other shelter residents, however, were unqualified opinions. None of these supporting documents, however, resolved child-safety concerns that initially led to the dependency proceedings.

Moreover, from March to August 5, 2013, mother used San Bernardino County providers for services. Her first petition included proof of her attendance at five AA meetings in June and July 2013, and her agreement to pay for substance abuse treatments. Mother lacked proof of attendance in treatments and random testing. Her second petition filed in December showed that mother began to address her substance abuse in Los Angeles County on October 22, 2013. Mother had a gap in service participation from August 5th through October 22nd, and apparently left San Bernardino service providers

24

prematurely; there were no completion certificates, progress reports, or substance abuse tests from San Bernardino providers included in her section 388 petition.

Additionally, as of October 22, 2013, mother was a "new" client residing in transitional housing at Shields in Los Angeles, in an 18- to 24-month program. Clients at Shields were required to attend treatment five days a week. As of November 7, 2013, mother attended 12 dates of services with no absences. She, however, had 17 to 23 more months to go. Moreover, mother presented only two negative test results; this is insufficient proof that she resolved her chronic substance abuse.

Notwithstanding the above, in her reply brief, mother argues that CFS "waters down mother's efforts, even if belated," because the record showed that "mother did make significant changes to her life[.]" However, CFS did not need to "water down" mother's efforts. The facts presented by mother showed that she was starting to change; this is not enough. Mother needed to demonstrate a genuine change of circumstances, which she failed to do.

*In re Anthony W.*, *supra*, 87 Cal.App.4th 246 is instructive to this case. In that case, the court held that it was not an abuse of discretion for the juvenile court to deny the mother's section 388 petition where the petition was not supported by a counselor's report or evidence of substantive progress. (*Id.* at pp. 250-252.) In this case, mother was a new client at Shields; she only started to attend classes and address her substance abuse issues. There was no evidence that mother benefitted from the services. (*In re Derrick S.* (2007) 156 Cal.App.4th 436, 445-450.) Her *changing* circumstances do not constitute *changed* circumstances. (See *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

25

In support of her argument that the trial court erred in summarily denying her section 388 petition, mother lists documents that support a change of circumstances. The documents show that mother completed a domestic violence program. She, however, did not complete a general counseling program, a parenting education program, substance abuse outpatient treatment, random drug testing, and a 12-step program. Mother also lacked any evidence required under the second prong of section 388 – that revoking the previous order by reinstating FR services would be in the best interests of the children. Mother had the burden of making a prima facie showing of a change in circumstances *and* best interest to the children to revoke the prior order for a hearing to be required under section 388. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 414-415; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806-808.)

The facts in this care are similar to the facts in *In re Angel B.*, *supra*, 97 Cal.App.4th 454. There, the appellate court affirmed the denial of a section 388 petition wherein the mother requested reinstatement of FR services for an adoptable child; the mother had a long history of drug abuse and tried rehabilitation without permanent success. (*Id.* at p. 459.) After termination of FR services, the mother enrolled in a substance abuse treatment program, tested clean for four months, and obtained employment. Nonetheless, the court denied the section 388 petition and terminated parental rights. (*Ibid.*) In affirming this order, the appellate court stated:

"[T]here is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. . . .

26

To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 465.)

In her reply brief, mother attempts to distinguish her case from *In re Angel B.*, *supra*, 97 Cal.App.4th 454. Mother provides that in *In re Angel B.*, the child was two years old at the time of the petition, never lived with the mother as she was detained at birth, and mother was not able to demonstrate a showing that the best interests of her child would be served by the modification. Mother states: "Unlike *In re Angel B.*, *supra*, here, according to Dr. Borden's psychological evaluation of Q.L., Q.L. hoped to return to and live with his mother and experienced significant abandonment issues due to this separation." It is true that Q.L. had a bond with mother. However, the facts also show that Q.L. was bonded with his siblings and had found stability while living with his siblings and prospective adoptive parents. Based on the information provided by mother in her petition, we find that the best interest of Q.L. would be served by continuing to live with his siblings, in a stable and loving home.

Mother filed her section 388 on December 13, 2013; the court denied it on December 16, 2013. In her opening brief, in support of the "best interest" prong under section 388, mother cites to her own testimony from a section 366.26 hearing held in January of 2014, one month *after* the court rendered its decision on her section 388 petition. Mother's reliance on that testimony does not assist her in this appeal.

First, mother's testimony was not in evidence at the time the court rendered its decision on the section 388 petition. She had the opportunity to present such evidence by

27

submitting her own declaration or a qualified opinion in support of her petition. She did not.

Second, even if we were to consider mother's testimony, CFS presented evidence to the contrary. Mother stated that "[a]t the termination hearing, mother specifically testified to how the children were happy to see her, called her "Mom," and truly enjoyed their time with her. They embraced her and cried when the visits were over." CFS, however, presented evidence that Q.L. was the only child who appeared to show distress that the visits were over. Although mother testified that she was "extremely close" to the children, she clarified that she had no bond with E1, who was removed from her custody at birth.. Even E2, E3 and E4 were young and removed from parental custody a good portion of their young lives. The simple fact that the children may have known mother to be their biological mother does not serve their best interest. In fact, the children were not best-served by delaying adoption by their fit and loving caregivers.

Third, mother attempts to use her bond with Q.L. to justify an alternative permanent plan for the younger siblings other than adoption. In essence, mother is attempting to argue the sibling-relationship exception to adoption.**[6]** Mother has forfeited this argument by failing to raise it in the trial court. (*People v. Tully* (2012) 54 Cal.4th 952, 996, fn. 15.) Nonetheless, one sibling's interests may not be used to defeat the adoption of other siblings. (*In re Celine R.* (2003) 31 Cal.4th 45, 54, 61-62.)

---

**[6]** Mother's opening brief does not refer to this exception to adoption. Her arguments, however, give rise to this issue without any legal support.

28

Section 366.26, subdivision (c)(1)(B)(v), sets forth the sibling exception, which may only apply due to "substantial interference" with bonded siblings. (*In re Celine R.*, *supra*, 31 Cal.4th at pp. 61-62.) Here, the exception does not apply since Q.L. resides with the E siblings. (See *In re B.D.* (2008) 159 Cal.App.4th 1218, 1236-1237 (the sibling-bond argument was moot once siblings were placed in the same household).).) Moreover, even if adoption interferes with a strong sibling relationship, the court must still weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive through adoption. (*In re Celine R.*, *supra*, 31 Cal.4th at pp. 61-62.)

In this case, mother filed a single section 388 petition for the E children and Q.L. The courts must evaluate the petition as to each child. The E children were under age 4, and have developmental delays requiring intensive services. The twins also have emotional issues. Although Q.L. was diagnosed with ADHD, medication was not recommended; he has no developmental delays. Q.L., who was 11years old, was differently situated than his siblings, who needed more parenting than Q.L. The younger siblings would benefit from adoption by the prospective adoptive parents, who are loving and capable of handling the E children.

In *Kimberly F.*, the appellate court held that the strength of relative bonds between each dependent child to both parent and caretakers is an appropriate consideration when evaluating a section 388 petition. (*Kimberly F.*, *supra*, 56 Cal.4th at p. 532.) Mother testified that the children were bonded to her. She, however, acknowledged that the age of the childern at removal adversely impacted her bonding, at least as to E1. CFS

29

reported that a profound bond developed between the children and the prospective adoptive parents, who served a parental role.  All of the children thrived and substantially benefitted from their relationship with their prospective adoptive parents, who gave them protection, care, love, affection, stability, and a safe place to live and thrive.  Mother requested FR services but FR services for adoptable children undermine permanence and stability – the required focus of the court after termination of FR services.  (*In re Marilyn H.*, *supra*, 5 Cal.4th at pp. 309-310.)

Mother's reliance on *In re Hashem H.* (1996) 45 Cal.App.4th 1791 is misplaced. *Hashem H.* involved the proposed plan of guardianship, a lesser plan than adoption, as proposed in this case.  Also, in that case, the mother's mental health problems triggered the dependency.  Jurisdiction in this case was based on the parents' non-accidental abuse of E3 and E4, and the failure to protect them from domestic violence and substance abuse.  Moreover, the mother in *Hashem H.* was employed and ready to take her child (she had overnight visits); she had a meaningful progress report; and her therapist recommended the child's return to the mother.  (*Id.* at pp. 1797-1798.)  Here, mother only had supervised visits, was not employed, did not have a meaningful progress report, and no professional recommended the children's return to mother.

Based on the above, we conclude that the juvenile court did not abuse its discretion in denying mother's section 388 petition without a hearing as to all the children.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
                    J.

We concur:

McKINSTER
        Acting P. J.

MILLER
            J.